IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIEL BRIAN WILLIAMS,                          Civ. No. 3:13-cv-01391-AC

                Plaintiff,                          OPINION AND
                                                                ORDER

    v.

INVENERGY, LLC, an Illinois corporation,
and WILLOW CREEK ENERGY, LLC, a
Delaware corporation,

                Defendants.

---

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff Daniel Brian Williams ("Williams") brings claims for statutory nuisance, common-law nuisance, and trespass to land. Williams's claims center on Defendants Invenergy, LLC,

("Invenergy") and Willow Creek Energy, LLC ("Willow Creek") (collectively "Defendants"), operating a forty-eight turbine wind farm (the "Wind Farm") near Williams's property.

Before the court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56.[1] Defendants assert Williams has failed to state a cognizable claim for statutory nuisance and failed to allege facts sufficient to state a plausible claim for trespass, and they seek dismissal of those claims. Defendants also assert Williams failed to exhaust his administrative remedies, and they seek summary judgment on this basis. Williams opposes Defendants' motion and further asserts the motion is untimely.

Defendants' motion is granted as to Williams's claims for nuisance *per se*, statutory nuisance, and trespass. Defendant's motion is denied as to Williams's alleged failure to exhaust his administrative remedies. Plaintiff's request to deny Defendants' motion as untimely is denied.[2]

### Background

On January 31, 2005, Morrow County granted Defendants conditional use approval to construct and operate a seventy-two megawatt wind-powered electrical-generation facility. (Compl. ¶ 8.) The Wind Farm consists of forty-eight wind turbines and is the first facility of its kind permitted in Morrow County. (Compl. ¶ 8.) Williams did not participate in the public portions of the permitting process. (Compl. ¶ 9.)

---

[1] Defendants' motion will be treated as a motion for judgment on the pleadings pursuant to FRCP 12(c) due to the case's posture as explained *infra*.

[2] The parties have consented to jurisdiction by magistrate judge, pursuant to 28 U.S.C. § 686.

OPINION AND ORDER                    2

During the summer of 2008, Williams and other local property owners (collectively "Property Owners") complained to Defendants about the potential adverse affects of the Wind Farm being constructed near their property. (Compl. ¶ 10.) David Iadarola, Defendants' project developer at the time, met with the Property Owners at Williams's home on July 16, 2008, to address these concerns. (Compl. ¶ 10.) At the meeting, Mr. Iadarola informed the Property Owners that Morrow County Ordinance No. MCC-5-96 governed the noise output of the Wind Farm. (Compl. ¶ 10.) Mr. Iadarola stated that ordinance allowed for the Wind Farm to make noise up to fifty-five decibels ("dBA") during the day and up to fifty dBAs at night. (Compl. ¶ 10.) A second meeting was held on August 13, 2008, at the Eaton residence. (Compl. ¶ 10.) At that meeting, Mr. Eaton informed Mr. Iadarola and Clint Brooks, Defendants's site manager, that statewide regulations controlled the issue and that those regulations allowed the Wind Farm to make noise only up to thirty-six dBAs. (Compl. ¶ 10.)

On November 3, 2008, the Property Owners complained about the anticipated noise pollution to Morrow County officials. (Compl. ¶ 13.) As part of this complaint, the Property Owners claim Defendants stated they could not comply with the thirty-six dBA standard and produced a computer mapping showing expected noncompliance with that standard. (Compl. ¶ 13.) On December 3, 2008, Defendants responded, asserting the thirty-six dBA standard would be met. (Compl. ¶ 14.) That assertion was later proven incorrect by Defendants' own testing. (Compl. ¶ 14.) Later that month, the Wind Farm became operational, with each turbine coming online sequentially. (Compl. ¶ 15.)

On January 7, 2009, Williams and the other property owners complained to Morrow County officials that noise from the Wind Farm exceeded thirty-six dBAs. (Compl. ¶ 16.) Additionally, the

OPINION AND ORDER                  3

Wind Farm was adversely affecting the health and sleep of the Property Owners in violation of the first condition of Defendants' conditional use permit. (Compl. ¶ 16.)

In response to this complaint, Defendants hired a wind energy consultant, Michael D. Theriault Acoustics, Inc., to conduct noise studies. (Compl. ¶ 18.) On May 13, 2009, noise monitoring systems were placed in Williams's home. (Compl. ¶ 18.) The energy consultant issued a report on June 19, 2009, registering the regular noise exceedances between forty-two and forty-three dBAs. (Compl. ¶ 18.)

From June 2009 to the present, Defendants attempted to reduce the noise produced by the Wind Farm. (Compl. ¶ 19.) Defendants designed, tested, and are now implementing a system for predicting when wind turbine noise adds more than ten dBAs to the background ambient noise, which system is intended to bring the wind farm into compliance with the applicable standards. (Compl. ¶ 19.) This system recognizes three conditions that, when present, require a shut down of turbines in close proximity to Williams's property: 1) high wind speed at the turbine hubs, 2) low ground wind speed at Williams's residence, and 3) wind out of the southwest. (Compl. ¶ 19.) This system will not catch all exceedances at Williams's residence. (Compl. ¶ 19.)

On May 25, 2010, the Morrow County Planning Commission ruled that Defendants were in violation of the state-wide noise standards. (Compl. ¶ 20.) For the following two years, Williams and Defendants litigated the issue twice before the Morrow County Planning Commission, three times before the Morrow County Court, and twice before the Land Use Board of Appeals ("LUBA"). (Compl. ¶ 20.) While LUBA found exceedences at Williams's property, it declined to require Morrow County enforce the ordinances because LUBA concluded it lacked that authority. (Compl. ¶ 20.)

OPINION AND ORDER                4

On June 29, 2012, Defendants set up acoustical measurement equipment on Williams's property to collect data. (Compl. ¶ 21.) Defendants used this data to design a system that would cutoff turbine operations to eliminate noise exceeding ordinance limits. (Compl. ¶ 21.) In January 2013, Defendants began shutting down certain turbines if certain conditions were present to test the relationship between weather conditions and noise in excess of ten dBAs over the ambient noise at Williams's property. (Compl. ¶ 21.) Predictive models show Defendants' current system will not curtail all noise exceedences. (Compl. ¶ 22.) In addition, the system Defendants are developing will go into action only after an exceedence takes place, instead of in anticipation of an exceedence. (Compl. ¶ 23(d).)

*Legal Standard*

I.  Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted.

On a motion to dismiss for failure to state a claim, the court must take as true all allegations of material fact, construing them in the light most favorable to the nonmoving party. *Am. Family Ass'n Inc. v. City & County of S. F.*, 277 F.3d 1114, 1120 (9th Cir. 2002). The court's review is limited to the face of the complaint, any documents referenced in the complaint, and those matters which the court may properly take judicial notice. *Schwartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Otherwise, as a general rule, a district court may not consider any material outside the pleadings when ruling on a FRCP 12(b)(6) motion. *Lee v. City of L. A.*, 250 F.3d 668, 688 (9th Cir. 2001).

A well-pleaded complaint must have "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a) (2014). A FRCP 12(b)(6) motion is granted if the allegations in the complaint are insufficient to state a claim for relief. FED. R. CIV. P. 12(b)(6)

(2014). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court explained the necessity of including sufficient facts in the pleading to give proper notice of the claim and its basis: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration omitted). With this in mind, the Court noted "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Later, in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009), the Court illuminated two principles underlying its decision in *Twombly*. First, that a court must accept as true all allegations in a complaint does not require a court to accept as true legal conclusions in a pleading. *Id.* at 678. Second, the complaint must contain a plausible, not merely possible, claim for relief. *Id.* at 679. The Court clarified that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2nd Cir. 2007)). Further, the Court concluded "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to entitlement to relief." *Id.*

## II. Motion for Judgment on the Pleadings.

A motion for judgment on the pleadings is governed by Rule 12(c), which states, "[a]fter the pleadings are closed – but early enough not to delay the trial – a party may move for judgment on

OPINION AND ORDER                6

the pleadings." FED. R. CIV. P. 12(c) (2013). The purpose of a Rule 12(c) motion is to challenge the sufficiency of the opposing party's pleadings, and the court applies the same standard as a motion under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108-09 (9th Cir. 2012). Accordingly, judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). If matters outside the pleadings are considered, the motion shall be treated as one for summary judgment. FED. R. CIV. P. 12(d) (2013).

## III. Motion for Summary Judgment.

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2012). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

OPINION AND ORDER                    7

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2012). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

## Discussion

Defendants assert four arguments. First, Defendants argue Oregon law does not recognize nuisance *per se* as a cause of action. Second, Defendants contend that Williams is attempting to transform a violation of noise ordinances into a common law claim for nuisance. Third, Defendants argue Williams has failed to allege facts sufficient for a trespass claim. Fourth, Defendants contend Williams failed to exhaust the administrative remedies available to him by failing to appeal LUBA's adverse determinations. Williams asserts that Defendants' motion to dismiss is not timely and should be dismissed on that ground. The court considers Williams's timeliness argument first, and then each of Defendants' arguments in turn.

## I.  Timing of Defendants' Motion to Dismiss

Williams's untimeliness argument actually challenges the sequencing, not timeliness, of Defendants' motion.  Specifically, Williams contends Defendants' motion to dismiss for failure to state a claim must be denied because Defendants filed their motion after, instead of before, they filed their answer.  Williams argues Defendants have thus relinquished the procedural right to attack his complaint under Rule 12(b)(6) for failure to state a claim, and they now may proceed only by a motion for judgment on the pleadings under Rule 12(c).  Williams asserts that because both Rule 12(c) and controlling case law require a motion for judgment on the pleadings be brought only after the pleadings are closed, Defendants' motion is untimely as premature.

A Rule 12(b)(6) motion "must be made *before* the responsive pleading." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004).  When a 12(b)(6) motion is filed after the answer, the motion should be treated as one for judgment on the pleadings. *Elvig*, 375 F.3d at 954. *See also Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980) (holding that the "best approach" is to treat a motion to dismiss filed after the answer as a motion for judgment on the pleadings).  Thus, the question here is whether the court may consider Defendants' motion now, or whether Defendants must refile their motion once the pleadings are closed.

Defendants' motion is timely for two independent reasons.  First, Defendants' motion is consistent with Rule 12 (c)'s requirements.  Federal Rule of Civil Procedure 12(c) directs that a motion for judgment on the pleadings be filed "[a]fter the pleadings are closed[.]"  The pleadings are closed when all required or permitted pleadings, as defined in Rule 7(a), have been filed and served. *Norcal Gold, Inc., v. Laubly*, 543 F. Supp. 1132, 1135 (E.D. Cal. 2008). *See also In re Villegas*, 132 B.R. 742, 745 (9th Cir. BAP 1991) ("Pleadings are not closed until at least an answer

OPINION AND ORDER                    9

has been filed . . . . Judgment on the pleadings may not be entered where no answer has been filed."). Rule 7(a) defines pleadings as the complaint; answer to a complaint, counterclaim, or cross-claim; a third-party complaint; an answer to a third-party complaint; and a reply to an answer.

Williams filed his complaint on August 9, 2013, and Defendants filed their answer on October 22, 2013. The case law makes clear that a motion for judgment on the pleadings may be filed as early as after the answer is filed, but may not be filed before the answer is filed. Defendants filed their motion to dismiss well after they filed their answer. Further, in the time since Williams filed his complaint and Defendants filed their answer, neither party has filed or sought leave to file additional pleadings, and neither party has suggested, directly or indirectly, that further pleadings are, or might be, forthcoming. On this record, therefore, the pleadings in this case effectively are closed and Defendants' motion thus is properly filed and considered as a motion for judgment on the pleadings.

Second, Defendants' motion to dismiss is consistent with the court's December 2, 2013 scheduling order. At the Rule 16 conference held that date, the court directed Defendants to file any motion to dismiss no later than February 3, 2014. The court's minute order confirmed this directive: "Any motion regarding plaintiff's exhaustion of administrative remedies and/or failure to state a claim are to be filed no later than February 3, 2014." (Dkt. No. 16.) By setting an early date for Defendants to file all motions challenging the sufficiency of Williams's claims or the appropriateness of Williams's claims being heard by this court, the court intended to resolve all procedural issues that could affect the nature and scope of the parties' discovery efforts, and to focus the legal issues to be decided.

Thus, Defendants timely filed their motion to dismiss under rule 12(b)(6) consistent with the court's scheduling order, which modified the rule's timing requirements. The court has the express authority to do so. *See* FED. R CIV. P. 1 (the rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). *See also* FED. R CIV. P. 16(a) (authorizing the court to set case schedules in part for the purposes of expediting case disposition, managing case activities, and discouraging wasteful pretrial activities). For this additional reason, Defendants' motion is timely filed.

The remaining question is whether the court should consider Defendants' motion under the Rule 12(b)(6) standard or the Rule 12(c) standard, because either standard could apply in light of the procedural posture created by the filing sequence of answer, Rule 16 order, and motion to dismiss. Ultimately, it makes little difference which standard is applied here because the two standards essentially are the same: both Rule 12(b)(6) and Rule 12(c) require the court to accept as true the allegations in the complaint in determining whether a complaint sufficiently states a claim upon which relief may be granted. *Compare, e.g., Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (applying Rule12(c), court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party"), *with Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (applying Rule 12(b)(6), the court must "accept as true the facts alleged in the complaint" and must "draw inferences in the light most favorable to the plaintiff"). While the two rules differ in some ways, those differences are not relevant here because Defendants' challenges do not implicate factual disputes: defendants contend Williams's statutory nuisance claim is not a cognizable legal theory, and argue his trespass claim fails to satisfy the elements for such a claim even if all his allegations are true.

OPINION AND ORDER                    11

The court will apply the Rule 12(b)(6) standard. The court specifically ordered Defendants to file motions to dismiss by February 3, 2014, even though Defendants already had filed their answer, under its authority to manage cases efficiently and expeditiously. Further, Rule 12(h)(2) makes clear that a challenge of failure to state a claim may be raised at anytime, including at trial, notwithstanding the number or subpart of the rule used to invoke that challenge.

## II. Nuisance *Per Se* and Statutory Tort

Defendants contend Oregon law does not recognize a "statutory nuisance" claim for the violation of a statute or ordinance. Defendants cite *Dept. Envtl. Quality v. Chem. Waste Storage & Disposition, Inc.*, 19 Or. App. 712 (1974) ("*DEQ*") in support of their position, a case which evaluated the circumstances under which violation of a statute constituted nuisance *per se*. Williams responds first that ORS § 467.010 and Oregon Administrative Rule ("OAR") 340-035-0035, *et seq.*[3] (together the "Provisions"), contemplate nuisance liability, and that violation of the Provisions constitutes nuisance *per se* when Oregon principles of statutory construction are applied. Williams alternatively argues the court should infer a statutory nuisance claim from the Provisions based on the mandatory duty they impose, and he cites two cases that address statutory duty, *Nearing v. Weaver*, 295 Or. 702 (1982), and *Scovil v. City of Astoria*, 324 Or. 159 (1996), to support his alternative position.

### A. *Per Se and Statutory Tort Theories.*

Properly analyzing Williams's argument first requires distinguishing between a nuisance *per se* theory and a statutory tort theory. The parties' respective briefing conflates the two theories and

---

[3] In his brief, Williams cited OAR 345-035-0035, which does not exist. At hearing, Williams clarified that OAR 340-035-0035 is the regulation he intended to cite.

the elements of each to some extent, but Williams's briefing makes clear he advances each of these two theories as separate basis of Defendants' liability. Summarized succinctly, the difference between the two theories is that under a negligence *per se* theory, a statute creates a standard of care, but under a statutory duty theory, the statute imposes only a duty to act. *See, e.g., Scovil*, 324 Or. at 173 ("ORS 426.460(1), as interpreted above, creates and imposes only a duty to act as it provides. It does not create a standard of care and, therefore, plaintiff's negligence *per se* claim is without foundation in that statute.") (footnote omitted). Thus, the differences between these two theories first must be clarified before analyzing the question whether Williams may use the Provisions as the basis for a civil cause of action against the Defendants.

Negligence *per se* is a doctrine which modifies an existing common law negligence action. Caroline Forell, *The Statutory Duty Action in Tort: A Statutory/Common Law Hybrid*, 23 IND. L. REV. 781, 782 (1990), *citing* W. PROSSER & W. KEETON, *On Torts* 222 (5th ed. 1984). Under a negligence *per se* theory, the statute establishes a standard of care against which the failure act in the particular circumstances is to be measured in negligence. *Scovil*, 324 Or. at 173. In *Safeco Ins. Co. of Am. v. Olstedt Cosntr., Inc.*, Case No. CV-02-1680-ST, 2004 WL 1050877 (D. Or. May 7, 2004), Judge Stewart of this court succinctly explained Oregon's negligence per se doctrine:

> Negligence *per se* is a common-law doctrine. Traditional negligence *per se* actions rest on the premise that a court has created, or should now be willing to create, a common law negligence action for persons like the plaintiff. To be liable for negligence *per se* in Oregon, the statute in question must be relevant. *See Miller v. City of Portland*, 288 Or. 271, 276, 604 P.2d 1261, 1264 (1980), *overruled on other grounds by Fulmer v. Timber Inn Restaurant and Lounge, Inc.*, 330 Or. 413, 9 P. 3d 710 (2000). The relevance test entails: "(1) [w]hether the injured person is a member of the class intended to be protected, and (2)[w]hether the harm is of a kind which the statute was intended to prevent." *Id.*

> A violation of a relevant statute does not make the defendant strictly liable as a matter of law. Instead, the violation is *prima facie* evidence of negligence, which can be rebutted by evidence that the defendant's conduct was nevertheless reasonable under the circumstances. *Maquiel v. Adkins*, 175 Or. App. 43, 50-51, 27 P.3d 1050, 1055 (2001), *review denied*, 333 Or. 73, 36 P.3d 974 (2001); *Barnum v. Williams*, 264 Or. 71, 78-79, 504 P.2d 122, 126 (1972).
>
> Furthermore, even if a person violated a relevant statute in a manner that was not reasonable under the circumstances, this conduct may be negligent *per se*, but it will not result in liability unless it caused the harm.

*Safeco Ins. Co. of Am.*, 2004 WL 1050877, at *11.

Thus, negligence *per se* modifies the existing common law. A statute is deemed to establish the standard of care if the legislature intended it to protect a class of persons and prevent a specific type of harm. Violation of the statute creates rebuttable evidence of negligence, but if the conduct is found to be negligent and to have caused plaintiff's injury, then the defendant will be liable.

A statutory tort creates new law from a statute that imposes a duty, but for which there is no legislative intent to create a tort action. *See, e.g.*, *Scovil*, 324 Or. at 172 ("[W]e have recognized 'statutory tort' duties in contexts where no common law duty exists but where a statute or ordinance created a special duty owed by a defendant to a plaintiff, usually arising from the status of the parties or the relationship between them.") (citation omitted). The statute must impose a special duty upon a specific group of persons owed to a specific group of persons. *Id.* An example of such statutes are "dram-shop acts," which impose duties upon servers of alcohol. Forell, *The Statutory Duty Action*, 23 IND. L. REV. at 783.

The question for a court addressing a statutory duty claim is whether, based on the statutory duty, the court should exercise its common law powers and provide a new tort action based on the statutory duty. *Id.* As the *Scovil* court noted:

OPINION AND ORDER          14

> "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action."

*Scovil*, 324 Or. at 171, *quoting Bob Godfrey Pontiac v. Roloff*, 291 Or. 318, 330 (1981). In deciding whether to exercise its common law powers, the court must look at the purpose of the statute and assess whether "a tort remedy is needed to enforce a statutory duty," taking into consideration whether or not the statute provides "a specific remedy, such as a civil penalty". *Scovil*, 324 Or. at 171.

### B. Nuisance Per Se

Oregon case law has specifically and clearly established the general rule in Oregon:  the existence of a nuisance is determined on a case-by-case basis, depending on the facts of the condition giving rise to the claim, unless a statute or regulation meets specific, narrow criteria which allow the creation of a nuisance *per se* cause of action.  The seminal Oregon case on point is *Dept. Envtl. Quality v. Chem. Waste Storage & Disposition, Inc.*, 19 Or. App. 712 (1974) ("*DEQ*").  There, the defendant operated a waste disposal site in violation of various sections of Oregon's Environmentally Hazardous Wastes Statutes, ORS 459.410 through ORS 459.690 ("the Statutes"). *DEQ*, 19 Or. App. at 713.  The State of Oregon, through the Department of Environmental Quality ("State"), sued the defendant and alleged that the defendant's operation constituted a public nuisance. *Id.*

///

OPINION AND ORDER          15

The court first observed that existence of a nuisance under Oregon law generally is determined based on the facts and circumstances of each case. *Id.* at 717-18. Oregon Supreme Court cases on nuisance emphasize, for example, that "'[t]he law of nuisance affords no rigid rule to be applied in all instances'" and that "'[w]hat is reasonable use and whether a particular use is a nuisance . . . depends upon the facts of each particular case[.]'" *Id.* The *DEQ* court then addressed the State's contention that defendant's operation of its facility in violation of the statutes constituted a nuisance *per se*:

> While, as we note below, defendant has been 'operating' the site in violation of the Environmentally Hazardous Wastes Statutes from the time they became effective in early 1972, that continuing violation does not require a finding that the site constitutes a public nuisance. We find nothing in ORS 459.410 through 459.690 declaring such a site to be a nuisance *per se*. These statutes do direct tight control of the operation or maintenance of such sites and provide sanctions to be imposed where compliance is lacking; they do not, however, serve to make that a nuisance which is not so in fact.

*Id.* at 719.

Implicit in the *DEQ* court's interpretation of the Statutes is that a condition or activity which violates a statute will not constitute nuisance *per se* unless the statute contains specific language that so provides. Other Oregon statutes contain such language and make clear the legislature's intention to create a nuisance *per se* remedy. For example, ORS § 105.555, entitled "Places of prostitution, unlawful gambling or controlled substances activities as nuisances," provides:

> (1) The following are declared to be nuisances and shall be enjoined and abated as provided in ORS 105.550 to 105.600:
>
> > (a) Any place that, as a regular course of business, is used for the purpose of prostitution and any place where acts of prostitution or patronizing a prostitute occur;

OPINION AND ORDER          16

(b) Any place that is used and maintained for profit and for the purpose of gambling or a lottery, as defined in ORS 167.117, by any person, partnership or corporation organized for profit and wherein take place any of the acts or wherein are kept, stored or located any of the games, devices or things that are forbidden by or made punishable by ORS 167.108 to 167.164;

(c) Any place that has been determined to be not fit for use under ORS 453.876 and that has not been decontaminated and certified as fit for use under ORS 453.885 within 180 days after the determination under ORS 453.876; and

(d) Any place where activity involving the unauthorized delivery, manufacture or possession of a controlled substance, as defined in ORS 475.005, occurs or any place wherein are kept, stored or located any of the devices, equipment, things or substances used for unauthorized delivery, manufacture or possession of a controlled substance. As used in this paragraph, "devices, equipment, things" does not include hypodermic syringes or needles. This paragraph does not apply to acts that constitute violations under ORS 475.860 or 475.864.

*See also* OR. REV. STAT. ANN. § 448.265 (1) (2014) (pollution of a water system); OR. REV. STAT. ANN. § 609.095 (1-3) (2014) (dogs as a public nuisance); and OR. REV. STAT. ANN. § 196.855 (1) (2014) (removal of material from the beds or banks or filling any of the waters of the state without a permit). Also important to the analysis here is that these statutory schemes also expressly authorize members of the public to file suit for injunctive or monetary relief, or that they otherwise mandate the appropriate governmental authority to act on the nuisance. *See, e.g.,* OR. REV. STAT. ANN. § 105.560 (2014) (authorizing private cause of action for violation of ORS § 105.555); OR. REV. STAT. ANN. § 448.265 (2) (2014) ("Violation of subsection (1)(a) or (b) of this section is a public nuisance and may be abated as other nuisances under the laws of this state."); OR. REV. STAT. ANN. § 609.095 (4) (2014) ("Any person who has cause to believe a keeper is maintaining a dog that is a public nuisance may complain, either orally or in writing, to the county or city."); OR. REV. STAT. ANN. § 196.870 (1) (2014) ("In addition to any enforcement action taken under ORS 196.860, civil

OPINION AND ORDER            17

proceedings to abate alleged public nuisances under ORS 196.855 may be instituted at law or in

equity, in the name of the State of Oregon, upon relation of the Director of the Department of State

Lands[,] or by any person in the person's name.").

Here, neither ORS § 467.010 nor OAR 340-035-0035, *et seq.*, explicitly identify a nuisance

or contain language creating a cause of action if a nuisance is found to exist.  ORS § 467.010,

entitled "Policy and legislative findings," states:

> The Legislative Assembly finds that the increasing incidence of noise emissions in
> this state at unreasonable levels is as much a threat to the environmental quality of
> life in this state and the health, safety and welfare of the people of this state as is
> pollution of the air and waters of this state.  To provide protection of the health,
> safety and welfare of Oregon citizens from the hazards and deterioration of the
> quality of life imposed by excessive noise emissions, it is hereby declared that the
> State of Oregon has an interest in the control of such pollution, and that a program
> of protection should be initiated.  To carry out this purpose, it is desirable to
> centralize in the Environmental Quality Commission the authority to adopt
> reasonable statewide standards for noise emissions permitted within this state and to
> implement and enforce compliance with such standards.

Similarly, OAR 340-035-0035, entitled "Noise Control Regulations for Industry and Commerce,"

states in relevant part:

> (1) Standards and Regulations:
>
> (a) Existing Noise Sources.  No person owning or controlling an existing industrial
> or commercial noise source shall cause or permit the operation of that noise source
> if the statistical noise levels generated by that source and measured at an appropriate
> measurement point, specified in subsection (3)(b) of this rule, exceed the levels
> specified in Table 7, except as otherwise provided in these rules.

The Provisions lack the clear and express language the *DEQ* court required to find a nuisance *per*

*se* remedy.

Williams's reliance on ORS § 467.131, ORS § 467.133, and § 7 of the Morrow County Code

Enforcement Ordinance to assert the Oregon legislature had nuisance liability in mind when enacting

OPINION AND ORDER          18

the Provisions is unpersuasive. ORS § 467.131 and ORS § 467.133 insulate operators of gun firing ranges from nuisance liability if the firing range's operation complies with specified conditions. Williams infers from these statutes that "[t]he legislature *clearly* contemplated that its noise statutes could result in actions alleging nuisance violations" (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 5), but this inference is contrary to Oregon law, as summarized by the *DEQ* court: a legal nuisance must be based on the specific facts at issue unless a statute clearly and precisely sets out the conditions which will constitute a nuisance. By their plain text, ORS § 467.131 and ORS § 467.133 provide no such clarity or precision; at most, they allow common-law nuisance claims involving gun firing ranges, but give no support to finding a nuisance *per se* action based on the Provisions.

Nor does Section 7 of the Morrow County Code Enforcement Ordinance support Williams's negligence *per se* argument. That section (which since has been repealed), provided three avenues for Morrow County to enforce OAR 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: citations, an injunction pursuant to ORS 30.315, or by the terms of a permit if one was issued for the use. The language of § 7 provides a method for Morrow County to enforce OAR 340-035-0035, but does not provide that a violation of that OAR constitutes a nuisance *per se*. Furthermore, § 7's text provides that any nuisance that exists in violation of the section is actionable only by an incorporated city or county; nothing authorizes an action by an individual.

C. *Statutory Duty.*

Williams alternatively argues that this court should infer a cause of action from ORS § 467.010, ORS § 467.020, ORS § 467.030, and OAR 340-035-0035. Those laws provide in relevant part:

OPINION AND ORDER                    19

## § 467.010 – Legislative findings and policy

The Legislative Assembly finds that the increasing incidence of noise emissions in this state at unreasonable levels is as much a threat to the environmental quality of life in this state and the health, safety and welfare of the people of this state as is pollution of the air and waters of this state. To provide protection of the health, safety and welfare of Oregon citizens from the hazards and deterioration of the quality of life imposed by excessive noise emissions, it is hereby declared that the State of Oregon has an interest in the control of such pollution, and that a program of protection should be initiated. To carry out this purpose, it is desirable to centralize in the Environmental Quality Commission the authority to adopt reasonable statewide standards for noise emissions permitted within this state and to implement and enforce compliance with such standards.

## § 467.020 – Prohibition on emission of noise in excess of prescribed levels

Except as provided in ORS 467.131 (Exemption from civil or criminal liability based on noise or noise pollution from shooting range) and 467.133 (Exemption from action for nuisance on basis of noise caused by shooting range), no person may emit, cause the emission of, or permit the emission of noise in excess of the levels fixed therefor by the Environmental Quality Commission pursuant to ORS 467.030 (Adoption of noise control rules, levels and standards).

## § 467.030 – Adoption of noise control rules, levels and standards

(1) In accordance with the applicable provisions of ORS chapter 183, the Environmental Quality Commission shall adopt rules relating to the control of levels of noise emitted into the environment of this state[.]

* * * *

(2) The Environmental Quality Commission shall investigate and, after appropriate public notice and hearing, shall establish maximum permissible levels of noise emission for each category established, as well as the method of measurement of the levels of noise emission.

(3) The Environmental Quality Commission shall adopt, after appropriate public notice and hearing, standards for the control of noise emissions which shall be enforceable by order of the commission.

(4) In adopting noise control rules, levels and standards under this section, the Environmental Quality Commission shall not adopt any rule that would impose liability for any activity for which immunity from civil and criminal liability is

granted or for which an action for nuisance is prohibited under ORS 467.131 (Exemption from civil or criminal liability based on noise or noise pollution from shooting range) and 467.133 (Exemption from action for nuisance on basis of noise caused by shooting range).

**OAR 340-035-0035 – Noise Control Regulations for Industry and Commerce**

(1) Standards and Regulations:

(a) Existing Noise Sources. No person owning or controlling an existing industrial or commercial noise source shall cause or permit the operation of that noise source if the statistical noise levels generated by that source and measured at an appropriate measurement point, specified in subsection (3)(b) of this rule, exceed the levels specified in Table 7, except as otherwise provided in these rules.

(b) New Noise Sources:

(A) New Sources Located on Previously Used Sites. No person owning or controlling a new industrial or commercial noise source located on a previously used industrial or commercial site shall cause or permit the operation of that noise source if the statistical noise levels generated by that new source and measured at an appropriate measurement point, specified in subsection (3)(b) of this rule, exceed the levels specified in Table 8, except as otherwise provided in these rules. For noise levels generated by a wind energy facility including wind turbines of any size and any associated equipment or machinery, subparagraph (1)(b)(B)(iii) applies.

(B) New Sources Located on Previously Unused Site:

(i) No person owning or controlling a new industrial or commercial noise source located on a previously unused industrial or commercial site shall cause or permit the operation of that noise source if the noise levels generated or indirectly caused by that noise source increase the ambient statistical noise levels, $L_{10}$ or $L_{50}$, by more than 10 dBA in any one hour, or exceed the levels specified in Table 8, as measured at an appropriate measurement point, as specified in subsection (3)(b) of this rule, except as specified in subparagraph (1)(b)(B)(iii).

Williams cites *Nearing v. Weaver*, 295 Or 702 (1982), and *Scovil v. City of Astoria*, 324 Or 159 (1996), to support his contention that these three statutes and the regulation impose a duty on Defendants, violation of which is actionable. Williams argues that under these cases, ORS § 467.030(4)'s express exclusion of gun ranges from noise nuisance liability suggests a legislative

intent to allow noise nuisance liability for other violations of these laws. Therefore, Williams concludes, the court should recognize a civil claim for relief based upon them.

Williams's argument is unavailing for three reasons. First, he asks this court, a federal court sitting in diversity, to create a new cause of action under state law, and there is no convincing evidence in the record to support the conclusion that the Oregon Supreme Court would create this new cause of action. Second, the laws on which he relies do not impose a duty on these Defendants. Third, the laws on which Williams relies do not support applying a statutory duty theory to create a civil cause of action based on those laws.

First, when this court sits in diversity it must follow state law as it exists. On matters of state law, federal courts interpreting and applying that state's law are bound by the decisions of the state's highest court or, if no decision exists, then it must apply the law as it believes the state's highest court would apply it. *See Ryman v. Sears, Roebuck and Co.,* 505 F.3d 993, 994 (9th Cir. 2007) ("Today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it."). *See also Vestar Development II, LLC v. General Dynamics,* 249 F.3d 958, 960 (9th Cir. 2001) (holding that "where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts."). "Convincing evidence" includes "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements[.]" *Id.* at 960, *quoting Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir. 1996). The

OPINION AND ORDER          22

decisions of other judges in the same federal district on the same issue, however, do not constitute "convincing evidence." *Ryman*, 505 F.3d at 995 n.1.

Here, the record contains convincing evidence that the Oregon Supreme Court would not infer a civil cause of action for nuisance from these statutes and the regulation based on a statutory duty theory. There is no case from either the Oregon Supreme Court or the Oregon Court of Appeals on the precise point Williams raises, but the decisions of both courts on nuisance *per se* causes of action evince a clear mandate for judicial restraint in this area. The Oregon appellate courts have stated clearly that the circumstances of each case are key to determining nuisance, and that finding a nuisance *per se* cause of action from a statute should occur only where a statute specifically and clearly provides a cause of action. Those nuisance *per se* decisions evince a judicial policy of restraint when considering whether a statute may be the basis of a civil action for nuisance. The reasons for this policy apply with equal logic to nuisance claims based on a statutory duty theory, and particularly here where a common law claim for nuisance already exists, and the statute and regulations upon which Williams relies create neither a special relationship between Williams and the Defendants or impose special duty on Defendants. Thus, the court concludes that the Oregon Supreme Court would not recognize a civil claim for nuisance under a statutory duty theory based on the statutes and regulation Williams cites.

Second, the statutes and regulation Williams cites impose a duty on the Oregon's Environmental Quality Commission ("EQC"), not persons or entities such as the Defendants. The interest ORS § 467.010 expressly creates the State of Oregon's in controlling noise pollution, and to protect that interest the statute gives EQC authority to establish and enforce statewide standards. Williams, however, is not suing EQC or the State of Oregon; he is not, as did the plaintiffs in

*Nearing* and *Scovil*, seeking to impose civil liability on governmental agency upon which the statute imposed a duty. Put simply, he asserts his statutory duty argument against the wrong defendant.

Third, the laws Williams cites do not meet the criteria articulated *Nearing* and *Scovil* for creating a civil cause of action under a statutory duty theory. In *Nearing*, the plaintiff brought a claim for negligent infliction of emotional distress against the police department for failing to arrest her husband pursuant to ORS § 133.310(3), which directed that "[a] peace officer shall arrest and take into custody" a person whom the officer has probable cause to believe is subject to a domestic relations restraining order and has violated that order. *Nearing*, 295 Or. at 704. The plaintiff alleged the police failed to comply with the statute after she made multiple reports that her husband repeatedly violated a valid restraining order. *Id.* at 705. The defendant argued that Oregon law did not recognize a claim for negligent infliction of emotional distress under these circumstances; plaintiff responded that such a claim is actionable when the conduct at issue "infringes some legal right of the plaintiff independent of an ordinary tort claim for negligence." *Id.* at 706.

Phrasing the question as whether plaintiff pleaded violation "of a legal right independently of the ordinary tort elements of a negligence action," the court found that plaintiff did so. *Id.* at 707. The court stated:

> The complaint alleges facts that, if proved, obliged the St. Helens police officers to respond to plaintiffs' call for protection against the exact kind of harassment by the [husband] that is said to have occurred, and it alleges that the officers refused to enforce the restraining order in the manner prescribed by law. The duty defendants are alleged to have neglected therefore is not an ordinary common law duty of due care to avoid predictable harm to another. It is a specific duty imposed by statute for the benefit of individuals previously identified by a judicial order.

*Id.* The court observed that where a person's legal interest is established by statute or court order and the statute is designed to protect the person from infringement of that legal interest or a specific

OPINION AND ORDER          24

form of harm, a statutory duty is created. *Id.* at 707-08. The court found ORS § 133.310(3) implied a duty which the police officers were required to fulfill: "In this case a duty specifically towards these plaintiffs arises from the statute coupled with the court order." *Nearing*, 295 Or at 708. The *Nearing* court explained:

> The statutes in this case, ORS 133.310(3), and its companion, ORS 133.055, are unique among statutory arrest provisions because the legislature chose mandatory arrest as the best means to reduce recurring domestic violence. They identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity.

*Id.* at 712.

In *Scovil*, the Oregon Supreme Court addressed a similar statutory duty argument. There, plaintiff sued the City of Astoria because city police officers released plaintiff decedent from custody while the decedent was intoxicated, almost immediately after which release decedent walked into the street against a red light and was struck by a car and killed. 324 Or. at 162. Plaintiff relied in part on ORS 426.460(1) (later renumbered ORS 430.399), which provided:

> "Any person who is intoxicated or under the influence of controlled substances in a public place may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. A person shall be deemed incapacitated when in the opinion of the police officer or director of the treatment facility the person is unable to make a rational decision as to acceptance of assistance."

*Scovil*, 324 Or. at 162. A second statute, ORS § 426.470 (renumbered ORS § 430.401), enacted with ORS § 426.460, provided in relevant part that "[n]o peace officer . . . shall be held criminally or

civilly liable for actions pursuant to ORS 426.450 to 426.470 . . . provided the actions are in good

faith, on probable cause and without malice." *Scovil*, 324 Or. at 162.

Plaintiff alleged three claims against defendant:  one claim for common law negligence, a

second claim based on a statutory tort theory for the failure to perform a duty imposed by the statute

to protect the plaintiff's decedent by taking her to a detoxification facility, and a third claim based

on a negligence *per se* theory for failure to exercise the standard of care allegedly established by the

statute.  *Id.* at 163.  The trial court dismissed plaintiff's statutory tort and negligence *per se* claims

before trial, and submitted the common law negligence claim to the jury.  *Id.*  After a verdict for

defendant, the plaintiff appealed.  *Id.* at 163-64.  The court of appeals reversed the trial court's

dismissal of plaintiff's statutory tort and negligence *per se* claims, and defendant filed a petition for

review in the supreme court.  *Id.* at 164.

The supreme court agreed with the court of appeals that plaintiff stated a claim for relief

based on defendant's violation of a statutory duty by failing to comply with ORS § 426.460, but

disagreed that plaintiff stated a claim for negligence *per se*.  *Scovil*, 324 Or. at 164.  The court

examined the ORS §§ 426.460 and .470 to determine whether they either "(1) create a duty, the

breach of which could be tortious to one harmed as a result of that breach, or (2) enacts a standard

of care, violation of which would constitute negligence *per se*."  *Scovil*, 324 Or. at 166.  The court

observed that "[w]hether a statute creates a duty, or enacts a standard of care, is determined by

discerning what the legislature intended."  *Id.*

Turning to the statutory duty claim, the court observed that the statutes created a mandatory

duty which, if violated, would result in consequences to the arresting officers unless they acted in

good faith, with probable cause, and without malice.  *Id.* at 167-68.  The court concluded that by so

providing in the statute, the legislature contemplated "that there could be liability in connection with the authority and duty to take the actions referred to in [the statutes]." *Id.* at 169-71. After further analyzing the language of the two statutes and other statutes contained in the act which included ORS §§ 426.460 and .470, the court concluded that both the text itself and the context of ORS §§ 426.460(1) and ORS 426.470 "disclose a legislative intent to impose on the police a statutory duty to act on behalf of a publicly intoxicated person who is a danger to self and further disclose that failure to act as mandated was contemplated by the legislature to give rise to a potential liability in tort in circumstances in which the limitations stated in ORS 426.470 do not apply." *Scovil*, 324 Or. at 166-69.

In reaching its conclusion, the supreme court expressly rejected defendant's argument that no statutory duty could arise unless the court found the legislature expressly intended a tort remedy would arise from breach of the duty the statute imposed. *Id.* at 169. The court noted that whether "a statute that imposes a duty also gives rise to a tort claim for breach of that duty is generally a matter for court decision." *Id.* at 170. The court quoted Restatement (Second) of Torts § 874A (1979), which states:

> "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action."

*Scovil*, 324 Or. at 171. The court's decision whether to fashion a remedy "is governed by the weight that a court finds reasonable to give to the protective purpose spelled out in the legislation." *Id.* Applying these principles, the supreme court found that "[p]ermitting a tort action in the

OPINION AND ORDER          27

circumstances alleged in this case is consistent with and serves to enforce the legislated duty imposed by ORS 426.460(1), which does not specify other means for its enforcement," and noted further that its conclusion regarding ORS § 426.460(1) found support in Oregon cases addressing other statutes that "impose[d] a duty to protect a specified group of persons." *Scovil*, 324 Or. at 172-73.

The court then addressed the plaintiff's third claim, also based on the statute but asserting negligence *per se*, which "posits that the statute establishes a standard of care against which failure of the police to act in these circumstances is to be measured in negligence." *Id.* at 173. The court held that "ORS 426.460(1), as interpreted above, creates and imposes only a duty to act as it provides. It does not create a standard of care and, therefore, plaintiff's negligence per se claim is without foundation in that statute." *Scovil*, 324 Or. at 173 (footnote omitted).

The statutes and regulation Williams cites do not meet Oregon's requirements for creating a civil cause of action under a statutory duty theory. First, under Oregon law the question whether these laws impose a duty that also gives rise to a tort claim for breach of that duty is for the court to decide. The court finds it unnecessary to create a tort claim here. The laws Williams cites contain adequate enforcement mechanisms for their violation, and he points to no circumstances which would prove a civil cause of action is needed to ensure the laws are enforced as intended. Second, the laws' language does not clearly create a specific duty for the benefit of a defined group of persons as did the laws at issue in *Nearing* and *Scovil*. Instead, these laws give the state a legal interest in controlling noise pollution and the enforcement power to protect its interest from infringement. Third, the laws are generally phrased and not specifically focuses. For example, ORS § 467.020 does not create a "duty specifically towards" Williams or others by identifying with precision "when,

OPINION AND ORDER          28

to whom, and under what circumstances" one must refrain from creating excess noise. Instead, the statute creates a general prohibition on noise pollution. Fourth, nothing in these statutes or regulation suggest a legislative intent to allow civil liability under the statute for their violation. Williams argues the exception for liability of gun range owners suggests by omission the legislature intended to allow civil liability of others, but the legislature just as reasonably could have concluded that common-law claims for nuisance adequately addressed those other situations.

## III. Trespass.

Williams brings a claim for trespass based allegations the Wind Farm invaded Williams's property by emitting low-frequency sound waves, vibrations, a flicker or strobe effect as the turbines' blades rotate, glare, and flashing red lights at night. Defendants argue this claim should be dismissed because Williams simply restates a complaint for nuisance and has failed to allege Defendants interfered with Williams's exclusive possession of the property. Williams responds that trespass does not require a physical entry into the property and can be found for intrusions like vibrations, odors, fumes, and gasses.

Oregon law is clear that nuisance and trespass concern the invasion of two distinct legal interests:

> Trespass and private nuisance are separate fields of tort liability relating to actionable interference with the possession of land. They may be distinguished by comparing the interest invaded; an actionable invasion of a possessor's interest in the exclusive possession of land is a trespass; an actionable invasion of a possessor's interest in the use and enjoyment of his land is a nuisance.

*Martin et ux v. Reynolds Metal Co.*, 221 Or. 86, 90 (1960). The Oregon Court of Appeals has also decided a case with a nearly identical factual basis to the instant case. *Frady v. Portland Gen. Elec. Co.*, 55 Or. App. 334 (1981).

OPINION AND ORDER                    29

In *Frady*, plaintiffs brought both nuisance and trespass claims stemming from damage defendant's wind farm caused by emitting vibrations and low frequency sound waves. *Id.* at 346. Several of the complaints contained allegations that the sound waves damaged their homes. *Id.* The *Frady* court overruled the dismissal of plaintiffs' nuisance claims but affirmed the dismissal of their trespass claims. *Id.* at 349-50. The *Frady* court reasoned:

> Plaintiffs' trespass counts are merely restatements of their nuisance counts. Plaintiffs have failed to allege any conduct on the part of defendant which would constitute a trespass as defined above. They allege no substantial interference with their possessory interest as distinct from their interest in the use and enjoyment of their property to warrant protection under the law of trespass.

*Id.* at 350 (citing *Martin*, 221 Or. at 96). Therefore, this issue turns on whether or not Williams's complaint alleges facts that support a substantial interference with his possessory interest in his property distinct from his interest in the use and enjoyment of his property.

Williams cites *Bedell et ux v. Goulter et al.*, 199 Or. 344, 361 (1953), for the proposition that trespass can be caused by vibrations of the soil and concussions of the air resulting from blasting, but his reliance on this case is misplaced. *Bedell* did in fact expanded Oregon's common law to allow for a trespass action from vibrations and concussions of the air, but only in a specific and narrow context: the court's decision extended the previous rule that "irrespective of negligence one lawfully engaged in blasting operations is liable for property damage sustained as a result of casting rocks or other debris on adjoining or neighboring premises," to include those circumstances in which the force of the explosion itself caused actual damage. *Id.* at 347. The court analogized the end result of the vibrations and the concussions, the shattering of the plaintiff's dwelling, to that of an explosion which hurled rocks or other projectiles onto a property and accomplished the same result. *Id.* at 361. The court determined that defendant was liable for trespass because the end result of the

OPINION AND ORDER                    30

vibrations and air concussions was as if physical material had been spewed on plaintiff's property. *Id. Bedell* does not stand for the proposition that vibrations alone can constitute an actionable trespass, but instead the narrower proposition that those who conduct ultra-hazardous activities, such as exploding dynamite, are liable for the resulting damages whether caused by projectiles or vibrations.

Williams's reliance on *Davis v. Georgia-Pac. Corp.*, 251 Or. 239 (1968), for the proposition that vibrations, odors, fumes, gasses, and smoke entering property are sufficient under Oregon law to constitute an interference with a property owner's possessory right, is similarly unavailing. In *Davis*, the plaintiffs alleged trespass because defendant's paper mill operation caused the intrusion of fumes, gases, and odors upon plaintiff's property. *Id.* at 242. Defendant argued "such intrusions constitute a nuisance rather than a trespass because there was no direct physical invasion of the property." *Id.* The *Davis* court acknowledged that Oregon law no longer required the intrusion of a visible and tangible object as a precondition to trespass. *Id.* at 243. Rather, trespass constituted "any intrusion which invades the possessor's protected interest in exclusive possession, whether that intrusion is by visible or invisible pieces of matter or by energy which can be measured only by the mathematical language of the physicist." *Id.* at 243 (quoting *Martin*, 221 Or. at 94).

Although Oregon trespass law no longer requires a physical object intrude on a person's property, it still requires a physical consequence to the property to support a trespass claim. In *Davis*, the plaintiffs alleged "the premises [were] rendered uninhabitable by the operation of defendant's plant because of the emanation therefrom of vibrations, offensive odors, fumes, gases, smoke and particulates which damage[d] the residence and plant life." *Id.* at 242. Williams alleges

OPINION AND ORDER          31

no physical consequence to his property, instead asserting that the Wind Farm's vibration, lights, and noise affected his personal comfort and convenience.

The absence of a physical consequence to Williams's property is what distinguishes Williams's circumstances from the *Davis* plaintiffs', and what deprives Williams of a cognizable claim for trespass here. As the Oregon Supreme Court has observed: "The mere suggestion that the casting of light upon the premises of a plaintiff would render a defendant liable without proof of any actual damage, carries its own refutation." *Amphitheaters, Inc. v. Portland Meadows*, 184 Or. 336, 343 (1948). There, the court, after looking at relevant precedent, determined the intrusion of light onto plaintiff's property was regulated by the law of nuisance, not trespass. *Id.* at 345.

Williams does not allege facts that substantiate an intrusion on his right of exclusive possession which are distinct from his claims for nuisance. Therefore, Defendants' motion to dismiss Williams's second claim for relief should be granted.

III. Failure to Exhaust Administrative Remedies

Defendants originally moved for leave to reserve for a later date their argument that Williams failed to exhaust his administrative remedies. The court chose to treat it as a motion for summary judgment on Williams's claim for injunctive relief. However, Defendants contend Williams's failure to exhaust his administrative remedies is relevant only to foreclose injunctive relief on his claim for nuisance *per se*. They do not move to prevent Williams from seeking injunctive relief pursuant to his common law nuisance claim. As the court has already discussed, Williams fails to state a claim for nuisance *per se* or statutory nuisance. Because Williams could still pursue injunctive relief whether or not the court grants this portion of Defendants' motion, the court cannot grant Defendants

OPINION AND ORDER          32

the relief they seek. Therefore, Defendants' motion for summary judgment on Williams' claim for injunctive relief is moot.

Even if Defendants' request was not moot, the court would deny it on the merits. "[T]he doctrine of exhaustion applies when a party, without conforming to the applicable statute or rules, seeks judicial determination of a matter that was or should have been in front submitted to an administrative agency for decision." *Outdoor Media Dimensions v. State*, 331 Or. 634, 661-662 (2001). ORS § 197.850 provides that parties to an action before LUBA may seek judicial review of that body's final order by appealing to the Oregon Court of Appeals. OR. REV. STAT. § 197.850(1)-(3). However, the requirement of administrative exhaustion in LUBA cases applies only when LUBA has exclusive original jurisdiction over the subject matter in question. *Mar-Dene Corp. v. City of Woodburn*, 149 Or. App. 509, 515 (1997)

LUBA promulgated two opinions in this case. In the first ("*Mingo I*"), it was unquestioned LUBA had exclusive jurisdiction over the land-use matters involved therein. However, the second LUBA case ("*Mingo II*") involved the County's decision to not enforce certain provisions of the CUP. LUBA recognized the subject matter of that case may strip it of jurisdiction, and engaged in a lengthy analysis of LUBA jurisdiction law. It concluded the facts were similar to those of *Mar-Dene Corp. v. City of Woodburn*, 149 Or. App. at 511. There, the plaintiff took issue with the Woodburn planning board's decision to not revoke a business's operating permit after the business violated terms of the CUP. *Id.* at 512. LUBA dismissed the claim for lack of jurisdiction, and the Oregon Court of Appeals affirmed. *Id.* at 516. After a careful review of the relevant statutes and regulations, the court of appeals determined that where a city decides to not apply its own rules,

regulations, and permit conditions, it is not a "land use decision" as defined by relevant statutes. *Id.* at 516.

The issues before the court in *Mar-Dene* were nearly identical to those before LUBA in *Mingo II*. After the first LUBA decision, the county determined that, although the Wind Farm exceeded noise levels articulated in the CUP, the noise exceedances were *de minimis*. Thus, the county would not revoke the CUP and order Defendants to cease operations. In *Mingo II*, LUBA recognized the unique factual context in which the case was brought, and concluded:

> [i]t appears to us to be beyond question that under [governing statutes and regulations] petitioners as affected land owners and county could have elected to proceed directly to circuit court to make their case that the Willow Creek Energy Facility is violating the noise standards and to ask the circuit court for one or more of the remedies specified by the statutes to compel Invenergy to comply with the noise standard.

(Pl.'s Resp. Ex 3 at 8.)

As LUBA made clear in *Mingo II,* Williams could have brought his claim for injunctive relief in a court of law at the outset. Because Williams could have originally brought his claim in Oregon state court, the obligation to exhaust administrative remedies never arose. Moreover, Defendants do not identify authority for the proposition that, when Williams nonetheless pursued his claims through LUBA, a renewed obligation arose to exhaust his administrative remedies. Therefore, Williams was not required to exhaust his administrative remedies before filing suit in a court of law, and Defendants are not entitled to summary judgment on Williams's claim for injunctive relief.

///

///

///

OPINION AND ORDER          34

*Conclusion*

For the aforementioned reasons, Defendants' Motion to Dismiss (Dkt. No. 19) Williams's

claims for nuisance *per se* and statutory nuisance is GRANTED.  Further, Defendants' motion for

summary judgment (Dkt. No. 19) on Williams's claim for injunctive relief is DENIED.

IT IS SO ORDERED

DATED this 16th day of December, 2014.

_____

JOHN V. ACOSTA
United States Magistrate Judge

OPINION AND ORDER          35